1                                                                              **O**

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                      CENTRAL DISTRICT OF CALIFORNIA

10                              WESTERN DIVISION

11

12

13   PABLO CAMARILLO, et al.            )      Case No. CV 07-03469 ODW (SHx)
                                        )
14                  Plaintiffs,         )
                                        )      Order **GRANTING** Plaintiffs' Motion
15   v.                                 )      for Award of Attorney's Fees [273]
                                        )      [Filed 11/12/10]
16   CITY OF MAYWOOD, et al.            )
                                        )      Order **DENYING** Defendants' Motion
17                  Defendants.         )      to Strike [293] [Filed 12/15/10]
                                        )
18                                      )      Order **GRANTING** Plaintiffs' Motion
                                        )      for Leave to Submit Evidence [306]
19   _____   )      [Filed 06/07/11]

20

21

22

23

24

25

26

27

28

                                        1

## I.   INTRODUCTION

Pending before the Court is Plaintiffs' Motion for an Award of Attorneys' Fees.[1] (Dkt. No. 273.)  Defendants filed an Opposition on December 6, 2010, (Dkt. No. 287), to which Plaintiffs filed a Reply on December 13, 2010. (Dkt. No. 292).  Having carefully considered the papers filed in support of and in opposition to the instant Motion and the arguments presented at the January 24, 2011 hearing, for the following reasons Plaintiffs' Motion is **GRANTED**, with appropriate reductions as detailed below.  Plaintiffs shall recover a total of $473,138.24 in attorneys' fees.  Additionally, Plaintiffs' Motion for Leave to Submit Evidence is **GRANTED**, and Defendants' Motion to Strike is **DENIED**.

## II.   BACKGROUND

The Court has recounted the factual background giving rise to these consolidated actions in its many previous orders.  Accordingly, the Court only briefly recites the procedural background and focuses on the relevant facts pertaining to the instant Motion.

At the outset of this litigation, which began in May 2007, these actions, which are now consolidated only for purposes of the instant Motion, were originally filed as one case.  The original case contained allegations asserted by twenty-two plaintiffs against nineteen defendants, relating to nine separate and distinct incidents of alleged misconduct occurring between 2005-2007.  (*See* Dkt. No. 43 at 2.)[2]  In January 2008, the Court granted Defendants' motion to sever.  (*See id.*)  Thereafter, Plaintiffs filed nine separate cases before this Court.  In most of the nine cases, Plaintiffs' counsel struggled to file a proper complaint for several months.  Indeed, in the lead case of *Camarillo v. City of Maywood*, an operative complaint was not filed until the Fourth Amended Complaint,

---

[1] The following eight cases have been consolidated for purposes of the Motion for Attorneys' Fees: *Camarillo v. City of Maywood, et al.* (CV 07-03469); *Barajas, et al. v. City of Maywood, et al.* (CV 08-03099); *Hernandez, et al. v. City of Maywood,* (CV 08-03103); *Molina v. City of Maywood, et al.* (CV 08-03105); *Herrera, et al. v. City of Maywood, et al.* (CV 08-03106); *Gonzalez, et al. v. City of Maywood, et al.* (CV 08-03107); *Garcia, et al. v. City of Maywood, et al.* (CV 08-03109); *Castro v. City of Maywood, et al.* (CV 08-03110).  (*See* Dkt. No. 267.)  For purposes of this Order, the seventeen Plaintiffs (Freddie Barajas; Shannon Board; Pablo Camarillo; Jesse Castro; Vanessa Garcia; Jose Gonzalez; Martin Gonzalez, Sr; Martin Gonzalez, Jr; Krystal Hernandez; Gerardina Herrera; Humberto Herrera; Manual Herrera; Eder Jimenez; Jesus Jimenez; Jose Molina; Jordan Payan; and Jose Quinones) are referred to collectively as "Plaintiffs."

[2] Unless otherwise noted, to the extent the Court refers to docket numbers, it refers to the docket in *Camarillo v. City of Maywood, et al.* (CV 07-03469).

almost two years after the filing of the original complaint. (Dkt. No. 87.) During this process and upon Defendants' motions, the Court dismissed several claims, including the Racketeer Influenced and Corrupt Organizations Act claim, the *Monell* claim against Defendants Bruce Leflar and Paul Pine in their official capacities, certain claims under the California Constitution, various claims pursuant to California Civil Code sections, and several tort claims. (*See* Dkt. Nos. 75, 84, 103.) Additionally, numerous individual Defendants were dismissed. (*See* Dkt. Nos. 103, 124, 142, 149.)

Once the cases proceeded beyond the pleadings phase, the parties attended a settlement conference before Chief Magistrate Judge Stephen J. Hillman, during which they were unable to reach an agreement. (Mot. at 3.) On the eve of trial, however, the parties met before a private third-party mediator and reached a tentative settlement agreement. (*Id.*) That same day, the parties, through their respective counsel, signed a Stipulation for Settlement ("Stipulation"), which was subject to approval of the Executive Committee of the Joint Powers Commission. (*See* Mann Decl., Exh. A.)

Subsequently, each of the seventeen Plaintiffs executed a separate settlement agreement (collectively, "Settlement Agreements"). (Opp'n at 3.) The Settlement Agreements provide that Plaintiffs may seek fees subject to Court approval. (*See* Mann Decl., Exh. A.):

> Defendants . . . shall pay to [Plaintiffs] . . . the sum of $1,525,000 – inclusive [of] all fees and costs, $1,025,000 of which is subject to challenge by [Defendants] . . . before Judge Wright – as payment in full for their claims arising from the events described in their complaints, divided as follows: $500,000 to all Plaintiffs, no more than $1,000,000 in fees to be determined via fee application by the Court, and $25,000 in fees (also subject to objection by [Defendants]) for work done by all [Plaintiffs'] counsel on fee application itself.

Thereafter, Plaintiffs filed the instant Motion for Award of Attorneys Fees, (Dkt. No. 273), for the maximum amount allowed under the Settlement Agreement – $1,025,000.

### III.   THRESHOLD ISSUES

Before discussing the merits of Plaintiffs' Motion, the Court addresses two threshold issues raised by Defendants.  Defendants argue that: (1) Plaintiffs lack standing to bring the instant Motion, and (2) Plaintiffs are not prevailing parties under 42 U.S.C. § 1988(b), and, therefore, are not entitled to attorneys' fees.  The Court addresses these arguments seriatim.

## A.   PLAINTIFFS' STANDING TO BRING THE INSTANT MOTION

Defendants assert that Plaintiffs lack standing to bring the instant Motion because the language of the Settlement Agreements precludes Plaintiffs from doing so.  In that regard, Defendants assert that (1) the Settlement Agreements, and not the Stipulation, reflect the final expression of the parties' and, as such, the provisions of the Stipulation have no effect; and (2) without the Stipulation provisions, the Settlement Agreements act as a waiver of Plaintiffs' rights to seek attorneys' fees.  However, the Settlement Agreements themselves, which Defendants "approved as to form and content," contradict both assertions.

With regard to the binding effect of certain provisions of the Stipulation, Defendants fail to recognize that the Settlement Agreements specifically reference the Stipulation and incorporate provisions therefrom.   Section 3 of the Settlement Agreements states:

> "Plaintiff[s], through [their] attorneys, may be entitled to attorneys' fees that the Court deems recoverable under applicable federal and state laws. The amount of any such recovery *shall be limited per the two page Stipulation for Settlement dated August 19, 2010*, and signed by counsel for all parties . . . ."

(Reply, Exh. A at 25 (emphasis added.))  Thus, the portions of the Stipulation on page two, at the very least, are incorporated into the Settlement Agreements.  The Stipulation states in pertinent part that "[Plaintiffs] will be guaranteed a distribution of $500,000, with fees to be determined (and opposed) up to a cap of $1.0 million + $25,000."[3]  (*See*

---

[3]   While arguably only the terms on page two of the Stipulation are incorporated into the Settlement Agreements, the language on page one sheds some light on what each amount is to represent:

Mann Decl., Exh. A at 42.)   Defendants cannot, in good faith, sign Settlement Agreements conferring rights upon Plaintiffs to seek attorneys' fees and then contest the validity of those rights upon such Application to the Court.   Thus, by the terms of the Settlement Agreements themselves, Plaintiffs have standing to bring the instant Motion. Assuming *arguendo* that the terms of the Stipulation were not incorporated into the Settlement Agreements, Defendants' contention that Plaintiffs "waived their right to receive any award of attorneys' fees," (Semon Decl. at 4), is also contradicted by the plain language of the Settlement Agreements.   The Settlement Agreements state that "[Plaintiffs] . . . forever waive any right to make any application for any costs or expenses whatsoever related to this lawsuit . . . *other than to the extent that attorneys fees are considered 'costs' under § 1988.*"   (Mann Decl., Exh. A (emphasis added).)  As to the Section governing release and discharge, the Settlement Agreements state: "In consideration of the payment set forth in Section 2 hereof and *except as limited as set forth in Section 3*, Plaintiff[s] hereby completely and fully release[] and forever

---

> Defendants . . . shall pay to [Plaintiffs] . . . the sum of $1,525,000 – inclusive [of] all fees and costs, $1,025,000 of which is subject to challenge by [Defendants] . . . before Judge Wright – as payment in full for their claims arising from the events described in their complaints, divided as follows: $500,000 to all Plaintiffs, no more than $1,000,000 in fees to be determined via fee application by the Court, and $25,000 in fees (also subject to objection by [Defendants]) for work done by all [Plaintiffs'] counsel on fee application itself. (Mann. Decl., Exh. A at 41.)

On a related manner, Defendants move the Court to strike any reference to a fee cap in Plaintiffs' Motion for Attorneys' Fees. (Dkt. No. 287-22.) Defendants' claim (1) that Plaintiffs are not permitted by the terms of the Stipulation to disclose the fee cap to the Court, (2) that the cap is "'immaterial' and 'impertinent' and not relevant to the Court's analysis," and (3) that they will be prejudiced by any reference to a cap on attorneys' fees because the existence of the cap "suggests that the defense in some way believes that the cap is a fair and reasonable amount." (*Id.* at 4, 5.) Defendants further assert that

> [i]deally, the Court should have been able to evaluate the Plaintiffs' motion, Defendants' opposition, and any Reply with an open mind and with no predetermination as to what "reasonable" attorneys' fees would be in this matter. However, the disclosure of the cap undermines the Court's ability to independently evaluate the plaintiffs' "reasonable" attorneys' fees, and consequently, prejudices the Defendants.

(*Id.* at 5-6.) First, the Stipulation states that the "[p]arties shall present said settlement to the court (initially) without references to the amount of or fact of a cap on . . . fees." (Mann Decl., Exh. A.) The plain language of this phrase suggests that it applies to the presentation of the settlement to the Court, which was conducted on August 23, 2010, (*see* Dkt. No. 267), not to the Fee Application itself. Second, the Court can assure Defendants that, in no way, has it been influenced by the existence of the cap. Accordingly, Defendants' Motion to Strike is **DENIED**.

discharge[] [Defendants]." (Reply, Exh. A at 22 (emphasis added).) Section 3 describes attorneys' fees. Consequently, Plaintiffs released Defendants from all liability, except that liability pertaining to attorneys' fees.

Having established that Plaintiffs have standing to bring the instant Motion, the Court now determines whether Plaintiffs are prevailing parties under 42 U.S.C. § 1988(b).

**B.     WHETHER PLAINTIFFS ARE PREVAILING PARTIES**

The Court may, in its discretion, award reasonable attorneys' fees to prevailing plaintiffs in a § 1983 action. 42 U.S.C. § 1988(b). Citing to the Supreme Court's decision in *Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health & Human Resources*, 532 U.S. 598 (2001), Defendants argue that Plaintiffs are not prevailing parties in this action. Defendants fail, however, to recognize the limits of *Buckhannon*'s holding. While *Buckhannon* concluded that a plaintiff who did not receive a "judicially sanctioned change in the legal relationship of the parties" and rather relied on a "catalyst theory" was not considered a "prevailing party," it specifically held that "settlement agreements enforced through a consent decree may serve as the basis for an award of attorney's fees." *Id.* at 605, 604. Indeed, the Ninth Circuit states: "In light of *Buckhannon*, we have held that a plaintiff who obtains a legally enforceable settlement agreement qualifies as a 'prevailing party,' at least when the district court retains jurisdiction to enforce the agreement." *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 451 (9th Cir. 2010) (citing *Richard S. v. Dep't of Dev. Servs.*, 317 F.3d 1080, 1088 (9th Cir. 2003)). Because the Court retained jurisdiction to enforce the parties' Settlement Agreements and to rule on Plaintiffs' Motion for Attorneys' Fees, (*see* Dkt. No. 269), it follows that Plaintiffs are "prevailing parties" within the meaning of § 1988.

Moreover, beyond the technicality of the Court retaining jurisdiction, Plaintiffs can establish that they are prevailing parties in a substantive manner. It is well-settled that a party prevails for the purposes of a fee award if it "succeeds 'on any significant issue in litigation which achieves some of the benefit [it] sought in bringing the suit.'"

*See, e.g.*, *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1160 (9th Cir. 2000) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).  In essence, a plaintiff prevails when

> his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff. . . . [A] material alteration . . . occurs [when] the plaintiff becomes entitled to enforce a judgment, consent decree, or settlement against the defendant.  In these situations, the legal relationship is altered because the plaintiff can force the defendant to do something he otherwise would not have to do.

*Barrios v. Cal. Interscholastic Fed'n*, 277 F.3d 1128, 1134 (9th Cir. 2002) (quoting *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1118 (9th Cir. 2000)).  Here, it cannot be disputed that the Settlement Agreements change the parties' legal relationships in requiring Defendants to pay a sum of $500,000 to Plaintiffs, and potentially up to $1,025,000 in attorneys' fees.  Having concluded that Plaintiffs are prevailing parties, the Court addresses the legal standards applicable in determining reasonable attorneys' fees.

## IV.   LEGAL STANDARD

Although the Court has determined that Plaintiffs are prevailing parties, this determination does not automatically entitle Plaintiffs to a full award of attorneys' fees.  *See, e.g.*, *Hensley*, 461 U.S. at 433.  Indeed, determining that Plaintiffs are prevailing parties only brings them "across the statutory threshold."  *Id.*  "It remains for the district court to determine what fee is reasonable."  *Id.*

In fashioning 42 U.S.C. § 1988, Congress "recognized that private enforcement of civil rights legislation relies on the availability of fee awards: 'If private citizens are to be able to assert their civil rights, and if those who violate the Nation['s] fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate these rights in court.'"  *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008) (quoting S. Rep. No. 94–1011, at 2 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5908, 5910).  Fee awards, however, "are not negotiated at arm's length, so there is a risk of overcompensation."  *Id.*  Thus, a district court should award "only the fee that it deems reasonable."  *Id.* (citing *Hensley*, 461 U.S. at 433).  "In making

7

the award, the district court must strike a balance between granting sufficient fees to attract qualified counsel to civil rights cases, and avoiding a windfall to counsel. *Id.* (citations omitted). "The way to do so is to compensate counsel at the prevailing rate in the community for similar work; no more, no less." *Id.*

In that regard, the first step is to determine the "lodestar" figure which is calculated by multiplying the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 406 (9th Cir. 1990) (citing *Hensley*, 461 U.S. at 433; *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986), *reh'g denied*, *amended on other grounds*, 808 F.2d 1373 (1987)). Once the "lodestar" figure has been determined, the Court may further adjust the award upward or downward based upon additional factors that may bear upon reasonableness. *Chalmers*, 796 F.2d at 1212; *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975); *Hensley*, 461 U.S. at 434. The "*Kerr* factors" are "intended to provide district courts with guidance" when adjusting the lodestar figure. *Chalmers*, 796 F.2d at 1211.[4] These factors were never intended to be exhaustive or exclusive. *Id.* at 1211. Because, however, several of the *Kerr* factors are subsumed within the "lodestar" calculation, courts must exercise caution when further adjusting the "lodestar" based on these factors. *See id.* at 1212.

Plaintiffs, as the fee applicants, bear the burden of documenting and supporting the fees requested in their petition. *See Hensley*, 461 U.S. at 433 ("The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed."). In challenging the reasonableness of the requested amount, however, Defendants have the "rebuttal burden of providing specific evidence that [Plaintiffs'] hours were duplicative or inefficient." *McGrath v. County of Nevada*, 67 F.3d 248, 255 (9th Cir. 1995) (quoting *Gates v. Gomez*, 60 F.3d 525, 534 (9th Cir. 1995)). After considering the parties'

---

[4]   The Kerr factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skills requisite to perform the legal service; (4) the preclusion of other employment; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstance; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Kerr*, 526 F.2d at 69-70.

evidence, if "the documentation . . . is inadequate, the district court may reduce the award accordingly." *Hensley*, 461 U.S. at 433.

Ultimately, an attorney's fee award must be determined on the particular facts of each case and is subject to the discretion of the Court. *Hensley*, 461 U.S. at 429; *Sorenson v. Mink*, 239 F.3d 1140, 1149 (9th Cir. 2001). After all, "[t]he district court is in the best position to determine in the first instance the number of hours reasonably expended in furtherance of the successful aspects of a litigation and the amount which would reasonably compensate the attorney." *Chalmers*, 796 F.2d at 1211. "Although the district court's calculation of an award need not be done with precision, some indication of how it arrived at its figures and the amount of the award is necessary." *Id.* (citing *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1447 (9th Cir. 1984), *modified*, 742 F.2d 520 (9th Cir. 1984)). Indeed, while "explicit mathematical calculations are not required," *Chalmers*, 796 F.2d at 1213, the district court must provide a "concise but clear explanation of its reasons for the fee award." *Hensley*, 461 U.S. at 437.

## V. DISCUSSION

The Court begins its analysis by discussing the reasonableness of Plaintiffs' counsels' hourly rates. Then, the Court discusses the reasonableness of the hours expended by Plaintiffs' counsel during this litigation. Finally, after determining the reasonable "lodestar," the Court discusses the appropriateness of further adjustments.

### A. REASONABLE HOURLY RATE

As explained above, in allocating an award of attorneys' fees under § 1988, the district court must "compensate counsel at the prevailing rate in the [relevant] community for similar work; no more, no less." *Moreno*, 534 F.3d at 1111. However, "determining a reasonable or prevailing rate of compensation is 'inherently difficult.'" *Chalmers*, 796 F.2d at 1210 (quoting *Blum v. Stenson*, 465 U.S. 895, 895 n.11 (1984)).

A reasonable hourly rate is defined as the "rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3 973, 979 (9th Cir. 2008). When assessing hourly rates in a relevant community, "courts must consider the ability of counsel, the

amount involved, customary charges for similar services, and the results obtained to determine a reasonable fee." *Lopez v. San Francisco United School District*, 385 F. Supp. 2d 981, 988 (N.D. Cal. 2005). "[T]he burden is on the fee applicant to produce satisfactory evidence – in addition to the attorney's own affidavits – that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Sierra Club v. EPA*, 625 F. Supp. 2d 863, 866 (N.D. Cal. 2007) (citing *Blum*, 465 U.S. at 896 n.11). "Once the fee applicant has proffered such evidence, the opposing party must produce its own affidavits or other evidence to rebut the proposed rate." *Cortes v. Metro. Life. Ins. Co.*, 308 F. Supp. 2d 1125, 1129 (C.D. Cal. 2005) (citing *United Steelworkers of Am.*, 896 F.2d at 407).

Here, Plaintiffs claim hourly rates at the high end of the attorney pay scale: Paul Hoffman – $750;  Robert Mann – $710; Donald Cook – $650;  Thomas Barham – $650; Ellen Hammill-Ellison – $550; Cynthia Anderson-Barker – $550; Samantha Koerner – $550; Olu Orange – $550; Colleen Flynn – $400; and Victoria Don – $250. *See generally* Atty. Decls.[5]  Additionally, Plaintiffs claim that their paralegals' hourly rates are as follows: Patricia Orantes-Gallegos – $235; Brian Gormely – $235; Dinorah Pinelo – $235; Carol Tokeshi – $235; Jon Cotton – $235; and Victoria Don – $235.  (Mot. at 16.)  In support of these rates, Plaintiffs rely exclusively on personal affidavits and the Declaration of Barrett Litt,[6] a civil rights attorney in Los Angeles, who attests that the

---

[5]  Rather than submitting each declaration individually, Plaintiffs' attorneys submitted their declarations in one document, docket number 274. Where appropriate, the Court cites to the document collectively as "Atty. Decls." or individually by each attorney's declaration contained therein.

[6]  Both parties make various evidentiary objections to and/or motions to strike declarations submitted by the opposing parties – Defendants to the Declaration of Barrett Litt and other declarations, (Opp'n at 9; Dkt. Nos. 287-24-34; 301), and Plaintiffs to the Declaration of James P. Schratz (Dkt. No. 293).  To the extent that these objections and motions are based on a lack of foundation and/or authenticity, the Court hereby **OVERRULES** the objections and **DENIES** the Motion to Strike.  These declarations are made by various legal professionals, who have adequately established their credentials to opine on the prevailing market rates.  The Court has considered the declarations and, as set forth more thoroughly in other parts of the discussion, has weighed the credibility of the evidence in making its final determination.  Additionally, Defendants' objections to Plaintiffs' Reply are **OVERRULED**.  (Dkt. No. 297.)  Finally, because the Court finds the information irrelevant to its decision, Plaintiffs'

rates charged are well within the range for attorneys in this community with comparable skill and experience.   Defendants, however, contend that Plaintiffs fail to provide sufficient evidence of local market rates for §1983 litigation. (Opp'n at 9-11.)  In support of their contention, Defendants cite various cases in the Ninth Circuit, in which attorneys' rates in §1983 litigation range from $165 to $400 per hour.  (*See* Opp'n at 10 (citing *Dang v. Cross*, 422 F.3d 800 (9th Cir. 2005) ($400 per hour); *Barjon v. Dalton*, 132 F.3d 496 (9th Cir. 1997) ($200 per hour); *Beltran Rosas v. County of San Bernardino*, 260 F. Supp. 2d 990 (C.D. Cal. 2003) ($300-$350 per hour); *Price v. Kramer*, 993 F. Supp. 1295 (C.D. Cal. 1997) ($200-$250 per hour); *Moss v. Assoc. Press*, 956 F. Supp. 891 (C.D. Cal. 1996) ($245 per hour for partners, $165 per hour for associates)).)  After reviewing the parties' submissions, for the following reasons, the Court agrees with Defendants and finds that Plaintiffs fail to establish that their requested fees reflect the prevailing market rate in the community.

### 1.   Plaintiffs' Counsel's Performance in This Case Does Not Merit the Rates Requested

When considering the appropriateness of counsel's requested hourly rate, a court may take into account: "(1) the novelty and complexity of the issues; (2) the special skill and experience of counsel; (3) the quality of representation; and (4) the results obtained." *Campbell v. Nat'l Passenger R.R. Corp.*,718 F. Supp. 2d 1093, 1098 (N.D. Cal. 2010); *Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1464 (9th Cir. 1988), *vacated on other grounds*.  In considering each of these factors, the Court finds that Plaintiffs' counsel's performance throughout this litigation does not merit the rates requested. Indeed, given the poor quality of service demonstrated here, the Court finds that a downward adjustment in the requested rates is warranted.

The Court is intimately familiar with the procedural history of this case, which presents a troublesome litany of ineffective lawyering.  From the start of this case

---

Motion for Leave to Submit Evidence, (Dkt. No. 306), is **GRANTED** only as far as the Court considers it in its reasoning as set forth herein.

Plaintiffs' counsel failed to demonstrate the quality of representation that would be expected from attorneys charging such high rates. Counsel had extreme difficulty meeting the Rule 8(a) standard of a "short and plain statement" entitling Plaintiffs to relief.  In some cases, Plaintiffs did not reach a stage in the litigation in which they had an operative complaint until the Fourth Amended Complaint – approximately fifteen months after the case was originally filed.  (*See* Dkt. No. 87.)  Additionally, counsel's failed attempts at consolidating the cases – in opposing motions to sever and in rejecting initial attempts to reconsolidate or bundle the matters – further evidence their inability to expeditiously prosecute a case and ultimately resulted in an unreasonable consumption of the Court's time.  (*See* Dkt. Nos. 32, 33.)  In that regard, Plaintiffs also prepared an extensive series of motions *in limine* that were ultimately stricken for failure to comply with the Court's Scheduling and Case Management Order, another waste of the Court's and the parties' time.  (*See* Dkt. No. 187.)  Further, the minimal monetary compensation obtained for Plaintiffs who suffered such egregious injustices certainly does not warrant the hourly rates claimed.  The parties ultimately signed the Settlement Agreements, whereby the seventeen Plaintiffs received a combined total $500,000.[7]  The Court considers this to be an unimpressive recovery for cases that have been litigated for several years and that involve such egregious factual circumstances.  Overall, the Court finds that the quality of Plaintiffs' counsels' representation weighs in favor of a reduction of the requested lodestar.

**2.     Evidence of Plaintiffs' Counsel's Rates in Recent Cases Does Not Support Their Rates Claimed in the Instant Case**

---

[7] Of the eight cases consolidated for purposes of the Attorney's Fees Motion, the Court cites two examples of what it considers to be extremely "low" damage awards in light of the egregious behavior alleged in the Complaints.  First, in *Hernandez, et al. v. City of Maywood*, (CV 08-03103), a fourteen year-old girl, who was allegedly sexually molested and fondled, received a mere $20,876 from the settlement.  (Wood Decl. ¶ 15.)  Second, in *Barajas, et al. v. City of Maywood, et al.* (CV 08-03099), five Plaintiffs, one of whom was a minor suffering from Down Syndrome, received only $12,734 from the settlement despite their allegations that Maywood officers entered their home, ordered Plaintiffs onto the sidewalk then proceeded to write them tickets for obstructing the sidewalk, screamed at them, forced them to the ground, and accused them of having weapons and drugs, and being gang members.  (*Id.*)  Overall, the average recovery is less than $30,000 per Plaintiff.  (*Id.*)

The fee applicant bears the burden to produce satisfactory evidence that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Sierra Club*, 625 F. Supp. 2d at 866 (citing *Blum*, 465 U.S. at 896 n.11).  Yet, Plaintiffs' counsel's own evidence contradicts their requested hourly rates.

First, in the months leading up to the filing of the instant Motion, several of Plaintiffs' attorneys received rates significantly lower than their requested rates.  The actual rate that an attorney can command in the market and customarily charges is itself highly relevant proof of the prevailing community rate.  *See Elser v. I.A.M. Nat. Pension Fund*, 579 F. Supp. 1375, 1379 (C.D. Cal. 1984); *see also United Steelworkers*, 896 F.2d at 407 (stating that "rate determinations in other cases, particularly those setting a rate for the plaintiffs' attorney," are evidence of the prevailing market rate).  Here, whereas in April 2010, Koerner requested $490 per hour in a similar case, she now seeks $550 per hour.  (Schratz Decl., Exh. 7.)  Whereas Hammill-Ellison requested $300 per hour in a similar case in June 2010, she now seeks $550. (Schratz Decl., Exh. 9.)  Neither Koerner nor Hammill-Ellison attempt to explain the cause of these dramatic increases, which occurred over the span of a mere six months, except to say each is "informed" that $550 per hour is the prevailing market rate. (Koerner Decl. at 24; Hammill-Ellison Decl. at 34.)  Such an unexplained and unsupported increase significantly undermines the credibility of Plaintiffs' stated hourly rates.

Second, in support of their rate requests, Plaintiffs cite two cases in which their attorneys allegedly received comparable rates.  These cases, however, are factually distinguishable and, consequently, do not support the rates requested in the instant case.  To the extent that Plaintiffs rely on the rates awarded in *Multi-Ethnic Workers Organizing Network v. City of Los Angeles* ("*MIWON*"), the Court finds that the facts underlying the *MIWON* litigation are drastically different than those presented in the instant case.  *MIWON* was a combined action of individual and class action claims, with over 300 plaintiffs. (*See* Def.s' RJN, Exh. A.)  In *MIWON*, the fee was determined based on a "class fund" theory, (*see id.* at 3), which is wholly inapplicable in the instant case.

13

Further, in awarding fees in *MIWON*, the court specifically noted the complexity of the case, the fact that the litigation involved a hybrid of individual and class action claims, the number of plaintiffs, the overall success for all plaintiffs, and the fact that the management of the residual fund would require future work.  (*See id.* at 2-22).  In comparison, the issues presented in the instant case do not rise to the level of those presented in *MIWON* nor does the level of success remotely compare.  Certainly then, four of the *MIWON* attorneys who are now seeking fees in the instant case *in excess* of those awarded in *MIWON*, have failed to present any factual basis to warrant a significantly higher hourly rate.  Such a request is disingenuous, at the least.

Similarly, Plaintiffs' reliance on the rates awarded in *Jochimsen v. County of Los Angeles* is also misplaced.  Unlike the instant case, which was resolved through settlement, *Jochimsen* proceeded to a lengthy jury trial, which culminated in the plaintiffs' success on a sole claim for an excessive force violation under § 1983. (Mot. For Leave to Submit Evid., Exh. A at 22.)  In *Jochimsen*, the appellate court explicitly stated that the "complete success" was the primary reason for the award of fees.  (*Id.*)  Here, the Court does not find such "complete success" present, where, as explained above, the seventeen Plaintiffs are left to split a settlement award of $500,000 in exchange for the egregious behavior alleged in their Complaints.

In sum, the fees awarded to Plaintiffs' attorneys in their recent cases are either lower than the fees they are currently requesting or are based on cases – *MIWON* and *Jochimsen* – that are too dissimilar to warrant comparable awards.  Consequently, the Court finds that Plaintiffs' evidence in this respect fails to support the rates they have claimed.

### 3.      The Litt Declaration is Not a Credible Reflection of the Prevailing Market Rate

"The fee applicant has the burden to produce evidence, other than the declarations of interested counsel, that the requested rates are in accordance with those prevailing in the community for attorneys of comparable skill and reputation." *Campbell*, 718 F. Supp.

2d at 1098.  As detailed above, Plaintiffs' attorneys' own declarations fall short. Similarly, the Litt Declaration (the "Declaration") fails to establish the reasonableness of their requested hourly rate.  The Declaration begins by listing 2009 partner rates ranging from $750 - $960 in fourteen "comparable" law offices in Southern California, such as Davis, Polk & Wardwell; Gibson Dunn & Crutcher; O'Melveny & Myers; Morrison & Forrester; and White & Case .  (Litt Decl. at 11-16.)  Curiously, the declaration also claims that some of its analysis is based on information from "confidential" sources. (Litt Decl. at 16.)  It appears as if Plaintiffs' attorneys' hourly rates are then adjusted for experience incrementally from a scale devised from the abovementioned rates.

There are several problems with relying on rates such as these, which are prevalent throughout the Litt Declaration.  First, the Court will not consider the information from "confidential" sources because there is no way of verifying its accuracy.  Second, at least one court in this district has found that a declaration merely listing firm rates with nothing more is insufficient evidence to support a fee request.  *See Elser*, 579 F. Supp. at 1379 ("At the very least counsel should have submitted substantive information regarding those attorneys and the nature of the work they performed which brought them those enviable fees.  It would be an abuse of this court's discretion to grant counsel's request on such a bare showing.").  In short, nothing included in the abovementioned rates describes the type of cases or nature of work that commanded such high rates.

Third, most of these rates are derived from very large, nationally-recognized firms with significant overhead and a primarily corporate clientele.  In fact, three of the firms – Weil, Gotshal & Mangers LLP; Davis, Polk & Wardwell; and Lieff Cabraser – cannot be considered at all in the calculation of the prevailing market rate in Los Angeles because they do not have offices in Los Angeles.  This significant oversight works against the declaration's overall credibility.  As to the remaining firms, at least one court in this district recognizes that the size of a firm can be taken into consideration when determining rates for lawyers of comparable ability and reputation.  *Common Cause v. Jones*, 235 F. Supp. 2d 1076, 1081-82 (C.D. Cal. 2002).  It is undisputed that this case was handled by five solo practitioners and one boutique civil rights firm with a single Los

15

Angeles office.  Consequently, the rates commanded by some of the nation's so-called "white shoe" law firms  are largely irrelevant.  Admittedly, the Declaration lists some small to mid-sized civil rights firms.  (Litt Decl. at 15.)  However, in light of the overall questionable credibility of the Declaration and the fact that there is no description of the cases these small firms were handling, these rates are certainly subject to scrutiny. Astoundingly, the Declaration fails to list *any* solo practitioner rates.  Moreover, with regard to paralegal rates, the Declaration merely lists the rates of Litt's own firm – Litt, Estuar & Kitson –  ranging from $125 to $235, based on experience.  (Litt Decl. at 17.)

In conclusion, the Declaration utterly fails to provide rates of firms representative of Plaintiff's attorneys' reputation, size, practice, and standard clientele, nor does it purport to provide comparable rates of solo practitioners, nor a substantial compilation of paralegal rates in the Los Angeles area.  Merely listing the rates of some of the most prestigious law firms in the country – three of which are not even located in Los Angeles – is utterly insufficient evidence to support this fee request.  The Court finds that the Litt Declaration lacks credibility.   In the final analysis, the Court concludes that Plaintiffs' fail to carry their burden to properly establish the prevailing market rates in the community**.**

### 4.       Plaintiffs Have Failed to Meet Their Burden in Establishing the Prevailing Market Rates

Not only has Plaintiffs' counsels' performance not merited the requested rates, counsels' own records undermine their requests.  "When a fee applicant fails to meet its burden of establishing the reasonableness of the requested rates . . . the court may exercise its discretion to determine reasonable hourly rates based on its experience and knowledge of prevailing rates in the community."  *Bademyan v. Receivable Mgmt. Servs. Corp*, No. CV 08-00519 MMM (RZx), 2009 WL 605789, at *5 (C.D. Cal. Mar. 9, 2009).   As previously discussed, Plaintiffs' own evidence supports a downward adjustment in Plaintiffs' rates for both the attorneys and paralegals.  In light of Defendants' assertion that similar attorneys' rates are $400 at the high end and Plaintiffs' assertion that the rates are $750 at the high end, the Court averages the two rates, which

results in a rate reduction of approximately 25%. The Court applies this 25% reduction to all attorney rates. Additionally, the Court adopts the lower paralegal rates provided in the Litt Declaration. Each paralegal shall receive $125 per hour.

Consequently, the adjusted rates are as follows:

| ATTORNEYS | | | | |
|---|---|---|---|---|
| **Attorney** | **Old Rate** | **New Rate** | **Hours** | **Total** |
| Paul Hoffman | $750.00 | $562.50 | 57.80 | $32,512.50 |
| Robert Mann | $710.00 | $532.50 | 250.80 | $133,551.00 |
| Donald Cook | $650.00 | $487.50 | 422.05 | $205,749.38 |
| Thomas Barham | $650.00 | $487.50 | 16.00 | $7,800.00 |
| Ellen Hammill-Ellison | $550.00 | $412.50 | 411.54 | $169,760.25 |
| Cynthia Anderson Barker | $550.00 | $412.50 | 874.10 | $360,566.25 |
| Samantha Koerner | $550.00 | $412.50 | 574.20 | $236,857.50 |
| Olu Orange | $475.00 | $356.25 | 31.00 | $11,043.75 |
| Colleen Flynn | $400.00 | $300.00 | 119.50 | $35,850.00 |
| Victoria Don | $250.00 | $187.50 | 157.00 | $29,437.50 |
| **TOTAL** | | | | $1,223,128.13 |

| PARALEGALS | | | | |
|---|---|---|---|---|
| **Paralegal** | **Old Rate** | **New Rate** | **Hours** | **Total** |
| Patricia Orantes-Gallegos | $235.00 | $125.00 | 1,051.41 | $131,426.25 |
| Brian Gormley | $235.00 | $125.00 | 2.60 | $325.00 |
| Dinorah Pinelo | $235.00 | $125.00 | 31.30 | $3,912.50 |
| Carol Tokeshi | $235.00 | $125.00 | 53.05 | $6,631.25 |
| Victoria Don | $250.00 | $125.00 | 254.10 | $31,762.50 |
| Jon Cotton | $235.00 | $125.00 | 24.50 | $3,062.50 |
| **TOTAL** | | | | $177,120.00 |

In light of the foregoing, Plaintiffs' adjusted "lodestar" after taking into account the hourly rate reductions is $1,400,248.13.

**B.   NUMBERS OF HOURS**

"In determining reasonable hours, counsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended." *Chalmers*, 796 F.2d

at 1210; *Hensley*, 461 U.S. at 437. The Court may, in its discretion, reduce hours "where documentation of the hours is inadequate; if the case was overstaffed and hours are duplicated; [or] if the hours expended are deemed excessive or otherwise unnecessary." *Chalmers*, 796 F.2d at 1210. When awarding attorney fees, the prevailing party may only be compensated for those hours of work that were "reasonably expended." *See L.H. v. Schwarzenegger*, 645 F. Supp. 2d 888, 896 (E.D. Cal. 2009) (quoting *Hensley*, 461 U.S. at 433-34). The burden lies with the prevailing party to provide sufficient evidence of the hours spent on the litigation. *Hensley*, at 461 U.S. 433-434. "The number of hours to be compensated is calculated by considering whether, in light of the circumstances, the time could reasonably have been billed to a private client." *Moreno*, 534 F.3d at 1111 (citing *Hensley*, 461 U.S. at 434) ("In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority.").

Moreover, "[d]espite the 'concise but clear' requirement, in cases where a voluminous fee application is filed in exercising its billing judgment the district court is not required to set forth an hour-by-hour analysis of the fee request." *Gates v. Deukmejian*, 987 F.2d 1392, 1399 (9th Cir. 1992) (citing *Jacobs v. Mancuso*, 825 F.2d 559, 562 (1st Cir. 1987)). "[W]hen faced with a massive fee application the district court has the authority to make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure 'as a practical means of trimming the fat from a fee application.'" *Id.* at 1399 (quoting *New York State Ass'n for Retarded Children v. Carey*, 711 F.2d 1136, 1146 (2d Cir. 1983)). Thus, the Court has independently analyzed Plaintiffs' records and finds that, as further explained below, the interest of justice is best served by making an across-the-board percentage reduction to account for: (1) Plaintiffs' inappropriate and ambiguous billing format; (2) billing entries unrelated to the instant matters; (3) impossible and ridiculous billing entries; (4) improper billing entries; (5) clerical billing entries; and (6) billing entries for travel time.

### 1. Plaintiffs' Irregular Billing Format is Extremely Problematic

To begin, Plaintiffs' billing records are organized in such a way that it is impossible for the Court to evaluate them to exclude "hours that are excessive, redundant, or otherwise unnecessary[.]"  *See Hensley*, 461 U.S. at 437.  Rather than grouping the entries by each "case" or "client," in a typical fashion, Plaintiffs' hourly records are formatted in an individualized fashion by each attorney.  In essence, without extreme inconvenience, the Court cannot reasonably determine if the record contains duplicate or excessive entries.  For example, if one or more fee applicants worked on the same project – *i.e.,* the drafting of a complaint or filing of a particular motion – without scouring the record and reorganizing the entries of the ten attorneys and six paralegals into a project-based, client-based, or case-based format, the Court cannot determine whether the applicants double-billed for any tasks.  The Court finds this incomprehensible format somewhat akin to"block billing,"[8] yet even more ambiguous.  In the case of block billing, courts are at least able to determine to which case or which client the entries are assigned. This is not so in the instant case.

Where courts are unable to properly analyze billing records to determine whether there is excessive or unnecessary billing – as with block billing – legitimate grounds exist to reduce or eliminate claimed hours.  *See Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2009).  This is so because it is "more difficult to determine how much time was spent on particular activities" – or in this case, on particular tasks with respect to each client or case. *See id.*  In circumstances like these, either line by line or across-the-board percentage cuts are within the discretion of the district court to reduce a fee award.  *Welch*, 480 F.3d at 948-49.  Because Plaintiffs extremely voluminous submission is formatted entirely in this manner, the Court cannot merely cut offensively-billed items from the record line-by-line.  "[S]uch a large expenditure of judicial resources in the face of such a miserable presentation[,]" would be unwarranted.  *See Norris v. Sysco Corp.*, 191 F.3d 1043, 1052 (9th Cir. 1999).  Indeed, in circumstances

---

[8]  "Block billing" refers to "the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks."  *Mendez v. County of San Bernardino*, 540 F.3d 1109, 1129 n.2 (9th Cir. 2008) (quoting *Welch*, 480 F.3d at 945 n.2).

such as this, the Court would be justified in "throwing up its hands and refusing to award any fees whatsoever." *See id.*  Instead, however, the Court reduces Plaintiffs' submitted hours by a percentage.  In this instance given that the billing format makes the entire record virtually indistinguishable such that the Court cannot reasonably determine whether "excessive, redundant, or otherwise unnecessary" hours have been billed, the Court finds that a 35% reduction is warranted.  *See Lahiri v. Universal Music & Video Distrib. Corp.*, 606 F.3d 1216, 1222-23 (9th Cir. 2010) (finding permissible district court's identification of attorneys and paralegals who were primarily responsible for block billing, and reducing 80% of their billable hours by 30%); *Welch*, 480 F.3d at 948-949 (reducing total billable hours by 20% across-the-board merely for billing in 15 minute intervals which the Court found too imprecise to accurately reflect time expended and citing the California State Bar's Fee Report, which concluded that block billing may increase time by 10% to 30%); *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 973 (D.C. Cir. 2004) (allowing a total reduction of 50% for improper billing entries and other inconsistencies).  Because the billing format permeates the entire record this percentage shall be applied to Plaintiffs' total hours.  *See Welch*, 480 F.3d at 948 (stating that a percentage reduction should apply only to hours or entries containing the offensive format).

### 2.    Billing Entries Unrelated to the Instant Cases

The Court finds particularly egregious Plaintiffs' bills related to matters that do not directly concern this case.  Specifically, the Court notes Plaintiffs' numerous entries for time spent staffing a free legal clinic in Maywood and travel time to and from the clinic. (*See, e.g.*, Exh. C at 83; Exh. J at 309-10, 346; Exh. L at 349-59; Exh. P at 383.)  While counsel should generally be applauded for *pro bono* activities, they cannot attempt to bill such activities – which do not directly support the seventeen Plaintiffs' claims, defenses, or recovery – in the context of the instant case.[9]  Additionally, Plaintiffs' counsel and

---

[9]  If counsel's work at the free legal clinic was, in fact, in some way related to the seventeen Plaintiffs involved here, they have utterly failed to provide the Court with specific evidence to that effect, *i.e.*, which of the seventeen Plaintiffs they met with at the clinic, what the meetings concerned, and the information gleaned from such meetings which might have furthered Plaintiffs' cases. Consequently, these entries are, at best, vague.

paralegals submitted numerous entries for assisting citizens regarding complaints about the police department's towing practices, which stem from a different and unrelated lawsuit. (*See, e.g.*, Exh. C at 54, 83, Exh. E at 139-45, Exh. L at 349, 352.)  Finally, Plaintiffs' counsel submitted several billing records for individuals not at all involved in the instant case.  For example, there are various entries referring to "Singleton" and a case entitled "*People v. Singleton*." (*See, e.g.*, Exh. B at 48; Exh. E at 186; Exh. J at 314; Exh. O at 378; Exh. P at 387.)  While it appears from the billing records that Singleton was a Maywood police officer, Plaintiffs' counsel has not explained his involvement in any of the instant matters.  As such, the entries for conducting research regarding Singleton's activities are unnecessary.  Moreover, such billing practices would never stand up to the scrutiny of a private client.  *See* Moreno, 534 F.3d at 1111 (citing the importance of "billing judgment" and stating that "[h]ours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority.").  Although not meant to be an exhaustive list, the Court also notes other similar references throughout the billing record to people such as "Salazar," "Jonas," "Densmore," "Seiden," and "Trujillo," and various public officials, such as "Cedillo" and "Rizzo." (*See, e.g.*, Exh. B at 52; Exh. C at 53, 82; Exh. E at 144, 156-59; Exh. J at 309, 311-13; Exh. N at 365-66; Exh. P at 383-84.)  If not wholly unrelated, these latter entries can be described as at least vague, considering the fact that the Court is unable to decipher how exactly they relate to the instant matters.  Because of the voluminous nature of Plaintiffs' records, the Court cannot make line-by-line deductions for Plaintiffs' counsel's inaccurate billing records.  Consequently, the Court deducts 20% from Plaintiffs' remaining hours, an amount which the Court considers reasonable given that such entries permeate the billing records.

### 3.     Impossible and Ridiculous Billing Entries

In addition to the concerning entries already set forth, Plaintiffs' billing records contain related, but wholly impossible entries.  A number of entries reflect a bill for one individual in excess of, or close to, twenty-four hours on a given date.  Specifically, on June 12, 2007, a paralegal billed sixty hours.  Her entries for that day simply stated:

"General: Scanned and profiled the DOC 1 for Krystal Hernandez." (Exh. E at 142.) On November 23, 2009, the same paralegal billed 22.95 hours in ten entries. (Exh. E at 184.) Another paralegal, billed 22.5 hours on December 14, 2009. (Mot, Exh. I at 306.) These few examples taken from the hundreds of pages of Plaintiffs' billing records demonstrate that counsel was not diligent in ensuring that their bills were accurate and reasonable. Plaintiffs' have since claimed that these entries are limited and due to clerical error. (Mot. to Strike Schratz Decl. at 8.) At no time, however, did Plaintiffs inform the Court of an adjusted lodestar figure once these discrepancies were brought to their attention.  In addition, considering the glaring omissions and inaccuracies previously described, the Court concludes that these are not individual mistakes but evidence of counsel's habitual inaccuracy and inefficiency evidenced throughout the entire billing record.

Moreover, the Court found numerous entries that defy categorization.  On April 12, 2010, an attorney billed thirty minutes as "Preparation," described further as "Tried several times to get into PACER without any luck." (Exh. D at 110.)  The same attorney also billed for a phone call, described as "call with guy from the scanning co re: what we need" and another call with a paralegal described as "when defense counsel call please apologize bc I'm stuck in traffic." (Exh. L at 121, 122.)  On February 20, 2007, another attorney billed an hour of time for travel from a liquor store to Maywood.   (Exh. L at 350.)  Further, on August 13, 2009, a paralegal billed for a "Paralegal conference re allotment of work." (Exh. H at 283.)  Finally, another paralegal continuously billed for maintaining her "to do list" and otherwise organizing her daily tasks. (Exh. I at 291, 295, 297, 307.)  This type of nonsensical billing would certainly be unacceptable to a private client, and, likewise, is unacceptable to this Court.

In light of the egregious nature of billing more hours in one day than are humanly possible and the type of absurd entries described above, the Court deducts an additional 20% from the remaining hours.

### 4.   Improper Billing Entries

The Court finds that the following billing entries, which are allegedly related to this case, are inappropriate.  First, Plaintiffs entries for work regarding efforts with the media

and the press, including exchanges with KCET, Telemundo, La Opinion, Macias, KPFK, LA Times, and MBCTV (*see, e.g.*, Exh. C at 53; Exh. J at 311, 351-354; Exh. K at 348; Exh. L at 352; Exh. P at 383-84), cannot be  rightfully billed.  *Gomez*, 60 F.3d at 535 (finding that district court abused its discretion in awarding fees for time spent with media because "[t]hese are the kinds of activities that attorneys generally do at their own expense."); *Agster v. Maricopa County*, 486 F. Supp. 2d 1005, 1016 (D. Ariz. 2007) (reducing the amount of hours requested for time spent dealing with the media); *Role Models Am.*, 353 F.3d at 973 (stating that time billed for discussions with the press is inappropriate).  Second, the Court notes that the fee applicants improperly billed several times for actually maintaining their own time records.  (Exh. D at 135, 137; Exh. P at 384; Exh. I at 291, 293, 295.)  Because these entries do not seem to be as numerous as the other categories, the Court reduces the remaining hours by only 5%.

### 5.    Entries for Clerical Tasks

Plaintiffs extensive submissions for clerical, secretarial and other non-legal tasks are also improper.  *See Sierra Club*, 625 F. Supp. 2d at 869 (citing *Missouri v. Jenkins*, 491 U.S. 274. 288 (1989); *see also Keith v. Volpe*, 644 F. Supp. 1312, 1316 (C.D. Cal. 1986) ("Time spent on 'filing, documents organization and other clerical matters' should instead be accounted for by a law firm's overhead and deemed to be included in the attorney's hourly rate.").  Here, Plaintiffs' request includes several entries for clerical duties, described in the record as "calendar," "fax," "format," "copy," "organize," and "scanning."  (Exh. C at 61, 82; Exh. E at 138-354; Exh. I at 292.)  These entries are replete through the billing records.  Consequently, the Court deducts an additional 10% from the remaining hours.

### 6.    Entries for Travel

Finally, Plaintiffs submit several entries for "travel."  (*See, e.g.*, Exh. J at 310-11, 316-28; Exh. L at 349-52, 358-60; Exh. N at 366-67; Exh. P at 405.)  Plaintiffs, however, have not submitted any evidence demonstrating a local customary practice of billing clients for travel time.  *See Davis v. City and County of San Francisco*, 976 F.2d 1536,

1543 (9th Cir. 1992) (noting that in order to recover attorneys' fees for travel time, counsel must submit evidence establishing that local attorneys customarily bill for travel time), *vacated on other grounds by*, 984 F.2d 345 (9th Cir. 1983).  Indeed, from this Court's experience, such travel time is not billable for local attorneys.  Accordingly, the Court makes an additional deduction of 5% for time billed as "travel."

### 7. Application of Percentage Reductions for Hours Not "Reasonably Expended"

After taking into account the hourly rate reductions, the Court determined that Plaintiffs' adjusted "lodestar" was $1,400,248.13.  The Court now applies the percentage reductions for hours not reasonably expended as follows:

| REDUCTION | AMOUNT REDUCED[10] | SUBTOTAL |
|---|---|---|
| Lodestar After Hourly Rate Reduction | | $1,400,248.13 |
| Improper Format (35%) | $490,086.85 | $910,161.28 |
| Unrelated Entries (20%) | $182,032.26 | $728,129.02 |
| Impossible and Ridiculous Entries (20%) | $145,625.80 | $582,503.22 |
| Improper Entries (5%) | $29,125.16 | $553,378.06 |
| Clerical Entries (10%) | $55,337.81 | $498,040.25 |
| Travel Entries (5%) | $24,902.01 | $473,138.24 |

Based on the figures above, the Court finds that Plaintiffs reasonable "lodestar" is $473,138.24.

## VI.   ADDITIONAL REDUCTIONS

The Court may further adjust the lodestar figure upon consideration of additional factors that may bear upon reasonableness of a request.  *Chalmers*, 796 F.2d at 1212; *Kerr*, 526 F.2d at 70; *Hensley*, 461 U.S. at 434.  The "*Kerr* factors" are "intended to provide district courts with guidance" when adjusting the lodestar figure.  *Chalmers*, 796 F.2d at 1211.  Because, however, several of the *Kerr* factors are subsumed within the

---

[10]  The Court calculates each reduction from the preceding subtotal.  For example, 35% of $1,400,248.13 = $490,086.85; 20% of $910,161.28 = $182,032.26, and so on.

24

"lodestar" calculation, courts must exercise caution when further adjusting the "lodestar" based on these factors.  *See id.* at 1212.  Here, the Court finds that it has properly accounted for the *Kerr* factors in its "lodestar" calculation.  Thus, no further reduction is warranted.  However, given the myriad of problems in Plaintiffs' presentation of their Motion, the Court declines to award Plaintiffs' attorneys' fees for preparing the Motion itself.

### VIII.   CONCLUSION

In light of the foregoing, the Court **GRANTS**, with the appropriate reductions, Plaintiffs' Motion for an Award of Attorneys' Fees.  Plaintiffs shall be entitled to a total amount of $473,138.24.  Additionally, Plaintiffs' Motion for Leave to Submit Evidence is **GRANTED**, and Defendants' Motion to Strike is **DENIED**.

**IT IS SO ORDERED.**

August 22, 2011

_____

HON. OTIS D. WRIGHT, II

UNITED STATES DISTRICT JUDGE